I'd like to reserve four or five minutes for rebuttal if I can. This appeal is here on a ruling of race judicata by Judge King, which kept the Wenatchee Tribe from getting to the merits of their case at all and issued a permanent injunction against them. We think this is wrong. We think the case should be remanded for trial on the merits. Since this is a race judicata case, I think it's very important to understand what this case is and what the 1989 litigation was that's held to be race judicata. They're very different. To begin with, you have to understand that the Wenatchee were a tribe that was supposed to get a reservation of their own at a place called the Wenatchee Pond Fishery at Icicle Creek. That's their traditional territory. Reservation was to be set up for them in the treaty, but it never was surveyed. As a result, the settlers came in, the railroad came in, and they went to the federal agents and said, what's happening? The federal agents said, oh my gosh, we forgot to survey the reservation. But the federal government then did is they deliberately surveyed the reservation up in the mountains where there were no salmon and where the Wenatchee didn't live. They then went to the Yakamas and said, this reservation up in the mountains is of no good, no use to you. It was part of Yakama treaty. No use to you. We'd like you to cede it. The Yakamas then understood things correctly, said that reservation belongs to the Wenatchee. We can't cede it to you. We can't sell our brother's house and take the money and get rich from it. Said you have to talk to the Wenatchee. The government did bring the Wenatchee in. John Harmel, their leader, was there. The government said to the Wenatchee, the reservation up in the mountains is of no use to you. We want that ceded, but what we'll give you is allotments right where you are at your fishery. You'll have as many acres as you would have had with the reservation. We'll also assure that you have your right to fish there. Where is that? In the 1894 treaty, as I recall, there's really nothing that directly addresses the fish other than the heading. Oh, that's correct. That's correct. The 1894 agreement. But the entire transcript that led to the agreement was filed with Congress and is in the transcript of records here. It's also discussed in the article by Richard Hart that's in the transcript of records. And it's very clear that the federal people said that expressly to the Wenatchee. But if there were fishery rights, the only reason this is relevant, it seems to me, is because the fishery rights, therefore, either had to come from the original 1855 treaty or they had to be a pertinent to whatever land was reserved in the 1894 treaty. But they weren't in the treaty agreement, but they weren't addressed in the agreement itself. They were by implication from the grant of the land in those circumstances. And if we're allowed to try this case on the merits, that is what we'll be arguing in the district court. And the district court will have the opportunity to rule one way or the other on that. All we're asking for is the opportunity to rule on it. I should point out that there are still Wenatchee allotments today as a result of the 1894 agreement, outside the Colville Reservation and at the Wenatchepan fishery. And I think that when we get into the law on that, the law will be very strong that the Colville Wenatchee still have fishing rights because of the 1894 agreement. But there's a second thing in the 1894 agreement. The people who brought this injunction against the Wenatchee fishing are the Yakama tribe. And in the 1894 agreement, the Yakama tribe, the first article of it says, the said Indians, Yakama nation, hereby cede and relinquish to the United States all their right, title, interest, claim, and demand of whatsoever name or nature of and to all their right of fishery, as set forth in Article 10 of said treaty, and also all their right, title, interest, claim, or demand to the said land above described or any corrected description thereof. They put that in because they knew they put it in the wrong place. So Yakama, as broadly as the government could think of language to do it, said, we're giving up all rights here. And it didn't just say a land. It said of the fishery. And and then the very next provision in the treaty. Then it's not a treaty in this statute. The agreement that was ratified by Congress says, in consideration of 20,000 dollars, the Yakama nation brackets 20,000 dollars. After the ratification of this agreement by Congress and the further consideration that the Indians known as the Wenatchee Palm Indians. Next, we get to the race to the kind of question. We get to the race to the kind of question. OK. Grace, you've got. So what what happened here? One other thing on this and I'll get more directly to the issue is for many years. You couldn't fish at the Wenatchee Palm fishery. The government built a fish hatchery exactly. They are. They built it after the Grand Coulee Dam was built to supply additional fish. But in recent years, there have been excess fish at the fish hatchery and the fish hatchery. People have been very good about inviting the Indians to come in and fish there. And both Yakima and Wenatchee have been fishing there. And a few years ago, the Wenatchee and Caldwell have been trying to negotiate this with the Yakima. The Yakima have been very unresponsive to any negotiation. Three years ago, when the Wenatchee were fishing, the Yakima filed the T.R.O. and Judge Marsh denied the T.R.O. and set the case for a hearing on preliminary injunction. We then submitted a settlement proposal to the to the Yakima in which the Wenatchee said they would fish by Yakima rules. We've now gone for almost 12, 8 of your 20 minutes and we still haven't gotten anywhere near the race to Dakota question, which is what we're here for. I'll go to it right now. In 1989, the Caldwell tribe, an entity that was created in 1938, wanted to intervene in U.S. v. Oregon. And to do that, U.S. v. Oregon had already been declared two or three times in this court and lower courts as determining the off-reservation fishing rights under the Stevens treaties, the 1855 treaties. To do that, they want they wanted to put it this way. They wanted to be a full player in it. They want to be one of the parties in that case. Judge Marsh had just denied intervention to the Makah tribe. And to intervene, Caldwell felt they had to do this, that they had to assert that they had treaty fishing rights, off-reservation treaty fishing rights under the 1855 reservation. All of the other Indians objected to Caldwell intervention and an event. But the federal government in the state of Washington said, we're OK with the intervention if Caldwell does two things. One, it proves that it, as this entity created in 1938, has treaty fishing rights under the 1855 treaties as successor to its constituent tribe. Some of its constituent tribes had. And secondly, it has to accept the law of the case as it is. It can't attack anybody else's rights. And it was under those conditions that the Caldwell tribes as an entity intervened. And the court ruled against them, said it is not the successor to the tribes. And because I'm short on time, the district court ruled on it one way. The Ninth Circuit ruled on it a slightly different way. More of a focus on the six individual tribes. Yeah, that's right. All right. So now we have one of the six tribes represented by the same entity, Caldwell, here again, complaining again about the fact that they, as I understand it, the 1894 agreement was really an implementation of the 1855 treaty. Because what happened in 1894 when the government wanted to conclude the agreement, it was pointed out that these promises had been made in 1855. And so the reference to the fishery was really to preserve what had already, what they hadn't preserved as a result of the 1855 agreement. Is that not accurate? I see it very differently because I see it as taking this totally out of the 1855 treaty. You know, the 1855 treaties with the Yaki says, OK, this piece of it is no longer there. We're going to deal with the Wenatchee the way we deal with Indians now in the 1890s. We don't make treaties. We give them a lot. But we'll let them keep their their fishing rights. But let me get because time is running out. Let me get very quickly to the race to issue. Did the Wenatchee have a full and fair opportunity to assert their rights under the 1890 agreement? In the other case, they didn't for two reasons. First, the the other the Caldwell was the only party there. Caldwell had to prove that it was a successor to all of the rights to win. It was trying to do that for all of the people. It was trying for a much larger goal to be put in. But for example, I have here the findings of actually conclusions of law that were introduced by the confederated tribes of the Coburn Reservation in the earlier proceeding. And they go on at some length about the Wenatchee in particular and in particular about the 1894 agreement. So there seemed to have been some belief that that issue was part of what was going on in the early proceedings. And well, of course, that was put in because that was part of the explanation of how the Wenatchee's got to the Caldwell reservation. But but Judge Marsh was very clear about what the issue was. He was deciding it was not that he said. I'm compelled to carefully delineate and define what I find is the central or core issue raised by the Caldwell complaint and intervention and further to emphasize what is not raised thereby the issue. This is what he decided in the case is whether the confederated tribes of Caldwell reservation may exercise authority as a separate treaty tribe to administer or regulate off-reservation treaty fishing rights based upon the fact that some of its members can trace their ancestry to parties to the Yakima-the-Nez Perce treaties of 1844. And he really can't. That's the way that the Caldwell tribe on behalf of its constituent tribes, which included the Wenatchee, chose at that point to forward their interest, which is still basically the same interest, which is the right to fish at this place at the present time. It's a very different thing to say that the Wenatchee members of the Caldwell tribe, who are the subjects of that 1894 agreement, can fish there. Or to say that all 8,000 members of the Caldwell tribe can fish there. But they were never saying that. It became clear when they came to the Ninth Circuit when they said we're not saying that. We're only talking on behalf of the six tribes. Didn't they say that very clearly? You don't know what the Ninth Circuit ruled? The Ninth Circuit said there was some confusion about that. It was pretty clear that Caldwell changed its view once they got to the Ninth Circuit. But still. I mean, there's another problem here, which is you're representing Caldwell, as I understand it. You're standing here right now representing Caldwell and yet seem to be trying to distance yourself from Caldwell. No, Caldwell at the time of the first case had a conflict of interest with Wenatchee because it was trying to win full inclusion for everybody in this whole big case. Caldwell doesn't have a conflict of interest with the Wenatchee's now. Caldwell accepts that it is not a treaty tribe and not part of U.S. v. Oregon. But it now says we have to look at the Wenatchee's themselves. This is not a treaty. This is 1894. I think this is exactly what race judicata is supposed to deal with. You had Caldwell on behalf of its tribe had one theory in 1989 about why they could fish at this particular place in the present. And now it has a different theory about the same thing. Same parties, same thing. Why can't these people fish at this place? You have a different legal theory, but you have the same problem. It's not a different legal theory. It's a different cause of action. And for race judicata, you have to have the same cause of action. I think you were mentioning in your brief the fact that you couldn't argue that the agreement because of the fact that that was a condition of being allowed to intervene, that you were only arguing treaty rights, not agreement rights. That's correct. And that, again, shows most dramatically and just honestly, really, that there wasn't a full and fair opportunity to present this Wenatchee issue. Because if you can't read to the court the most important part where the Yakamans gave all this up, how have you had a full and fair opportunity to do this? I want to comment on one more thing. I'll sit down and save my time for rebuttal. Mr. Weaver likes to say that the Wenatchee just went fishing. But that's a very unfair statement because court had already held that you can't intervene in USBR without having treaty rights that you can assert. They couldn't intervene in the case. They have these rights under the 1894 agreement. They've never been ruled on. And both Judge Marsh and Judge King agree that they haven't been ruled on. Judge King says they could have been ruled on. But I think, as you point out, Judge Huck, it couldn't have been because we couldn't present that full case there. And so this is not a question of just going fishing. This is a question of asserting your right the way the Indians of the northwest coast asserted their rights to get these treaty rights in the first place. They went fishing. I represented the Puyallup tribe when they were doing it and argued one of their cases in the Supreme Court. They just went fishing. And that's how they asserted their right. And that's how civil rights were asserted in the civil rights movement. A person went to a lunch counter, and he didn't bring a declaratory action to say that he could. And when somebody tried to throw him out, they said he has that right. And that's what the Wenatchee's have done here. And this is extremely important to them. And if they're to be deprived of that right, it ought to at least be after they've had an opportunity to state their case and argue their case on the merits. And I have to say to you that most of the faces you see here today are the Wenatchee people who feel this is an extremely important thing. I'll save my two minutes and 43 seconds. Thank you very much. Mr. Weaver. May it please the Court, I'm Tim Weaver, speaking on behalf of the Yakama Nation. I tried this case. I've been handling this case since 1988. Seems like deja vu all over again, Your Honors. First of all, I want to address Judge Huggs' remark regarding the fact that they couldn't bring this issue. The fact of the matter is, Your Honor, there's nothing in the record anywhere where the Caldwells ever said we're being restricted. Judge, you're unfairly stopping us from doing this. Well, the Court has said that. No, the Court did not say that. As a condition to coming in, the Court said, look, it has to be as a result of asserting treaty rights. Well, yes, and that's exactly what we're talking about here. That's the unfortunate situation. The issue that Mr. Sachse is talking about is Article 10 of the Yakama Treaty. It's Article 10 of the Yakama Treaty. It's not Article 10 of something else. When you read the Yakama Treaty, it talks about Article 10 of the Wenatcheepum Fishery, which this Court and Judge Marsh both ruled were part of the treaty. But the Wenatcheeps were not asserting their right under Article 10. They were asserting their right as part of the agreement that was made in 1894. Well, I guess I think that comes down clearly to this Court's ruling in the Tahoe-Sierra case where the Court said clever counsel can't simply put a new label on an old issue. What the Colvilles did here, and they admit in their briefing, Your Honor, that they made a litigation decision. When you read their brief, they made a litigation decision not to raise this issue before Judge Marsh. But to some degree, they did raise the issue, didn't they, at least to a degree of regarding the evidence of this agreement as pertinent to their earlier treaty-based claim? Because the two are intertwined, aren't they? Very much so, Your Honor. And they stipulate. We had a stipulation. We had a stipulation of facts which Judge Marsh adopted dealing specifically with this agreement. I cite that, and it's in the excerpt of the record. Where is that stipulation? It's also one of his findings. Where is the stipulation? Well, they submitted evidence of it. But they never made the argument that they were entitled to this right under the 1894 agreement. Well, of course, that's an interesting question. They certainly did present the evidence. Mr. Dick, who was a witness in the injunction proceeding and also in the U.S. v. Oregon proceeding, testified as to the agreement, testified as to the Wenatchee's and the Wenatchee-Pum agreement. They also presented an expert witness, whose testimony I've included in the supplemental excerpt of the record, who also talks about the Wenatchee-Pum agreement. And they stipulated as to what that agreement meant. You'll find that in Judge Marsh's ruling at 787 Fed Sup, 1580, where they stipulate that that agreement doesn't deal with the fishery at all. Yeah, well, it doesn't deal with treaty fishing rights. Well, what they do is they talk about the agreement. They don't talk about the treaty. They talk about the agreement, Your Honor. This is the situation that, of course, we find ourselves in, is they, when you read their complaint, and this is very important, they say that they were limited by Judge Marsh. In fact, they came forward and said, the Colville tribe is successor in interest to the Wenatchee, Entiat, Chelan, Columbia, and Palouse tribes of Indians. They also said the Colville tribe is successor government to those aboriginal tribes who signed the treaties and, therefore, the appropriate party to bring this action. This court held that the Colville held that it's not disputed that Colville is the only entity that can legally act on behalf of members of the Confederated tribes. Simply, no question, there is no Wenatchee tribe. That's another point that's important here is that Mr. Saxe says, well, the Wenatchee tribe is here bringing this claim. In fact, he represents the Colville tribe. When you read Mr. Dick's testimony in the injunction proceeding, you find that, in fact, Mr. Dick indicates that he is an enrolled member of the Colville tribe, and he very candidly states when he's asked by Mr. Saxe, how is the Wenatchee tribe organized? Mr. Dick says, well, we never thought of ourselves as really being organized. We just sort of occasionally give advice to the tribal council. The court needs to be very careful in dealing with that issue because there's simply no question but that these rights, all of the rights that are involved with the Wenatchee people, are tied directly to Colville. The record is replete in the trial of that. I would bet the question for the jury, if they were allowed to proceed, to litigate the matter rather than having it foreclosed by ratio to God. I'm sorry, I'm not sure. Why wouldn't that be an issue that would be some matter that would be litigated on the merits as to whether there was sufficient tribal culture preserved that could be asserted by Colville? Why wouldn't that be something? Well, it was presented to the trier of fact in this. But it wasn't litigated. Oh, certainly it was. Certainly. The issue of whether or not Colville represented these interests, well, they stipulated. For the treaty rights. They stipulated. For the treaty rights. I'm not sure that that's – I'm not sure that I totally agree with you, Your Honor. I think it said to the – one of the stipulations, I believe, said to the rights of all those parties, but I don't have that at the tip of my tongue. But the fact of the matter is, of course, the whole – you make a litigation decision. You're going to go forward and say, we want to have treaty rights. We want to take these rights. We're going to take all of these rights, which include Article 10 of the Yakima Treaty. When you read the Wenatchee Pum Agreement, it says it's based on Article 10 of the Yakima Treaty. For them now to say, well, gee, we didn't argue that, that the Colville tribe had a conflict of interest, and we didn't get to argue that, that simply isn't the case. The Colville – the Colville tribe is the people who are standing in front of you. Because they were asserting that all of these treaty rights conferred on Colville as a unit of the right to fish there, whereas this particular litigation would have to do with whether the Wenatchee tribe, as a part of Colville, would have the rights under the 1894 agreement. Well, once again, Your Honor, you get into – unfortunately, we get into kind of a circular argument there, because this Court has ruled and upheld Judge Marsh, saying that those people are part of the Colvilles. They're not an independent tribe. And, quite frankly, when you read the agreement, the agreement was made with the Yakima Nation, not with anyone – But quite aside from that, this is my understanding, which could be quite wrong. It is that in the 1889 proceeding, Colville, on behalf of six of its constituent tribes – Was it the 1998 proceeding? 1989, no. 89, I'm sorry. I'm sorry. On behalf of six of its constituent tribes, and trying to trace the – was trying to establish for itself, but tracing through those tribes, that they had fishery rights co-equal with those of the other tribes that were involved in the Argon case. And in doing that, they went to the 1855 treaty, which has this Article 10, and that was one source for which they were trying to find these fishery rights. And then the question became, well, how did those fishery rights from 1855, assuming they existed, work their way through to the present so that they still existed? And to that, the 1894 treaty was part of the answer. That's my understanding. I believe that's exactly what they said. And they put it into evidence, and they argued it to the court, that it was part of the evidence that not only Colville, but these Wenatchee people who now are claiming tribal – It was a sub-part of the claim there, because essentially pieces of that claim rested on different – the different histories of the sub-tribes, even though they were representing all of them at that point. Very much so. And they traced through to the present in different ways. And the Wenatchee claim traced through to the present through the 1894 agreement. Without the 1894 agreement, they would – they could have been – they would not have had the claim that they were asserting at that point. That's my sense of it. I believe that's absolutely correct, Your Honor. They chose – they chose to make that argument. They chose not to make the argument that they're making here. It's the classic situation in – when you read the – read the Tahoe – your Tahoe case, Tahoe Sierra case, it says it's not only the claims that were made, but the claims that could have been made. Well, that's true when you have two parties that are litigating, and they start to litigate. Here we've got a different situation. We've got an intervention, and conditions were set as to what could be argued in order to be allowed to intervene. Well – And you couldn't argue anything other than treaty rights. I don't believe that's the case, Your Honor. I believe the Colvilles – the Colvilles made the argument in their complaint as to what they were going to do. Judge Marsh did not make an initial ruling saying that you cannot argue these other issues. That's point number one. Point number two, when – when you look throughout the record, there is at no point – there is at no point that Colvilles says – and this is – this ties directly to the – the race judicata claim – that Colvilles said, Judge, that's unfair because we have this claim under – under this – this agreement that we're submitting into evidence and that we're presenting expert testimony to and that we're stipulating to. But that is different. That's different than what you're saying. But in general – I mean, if you have, for example, exclusive jurisdiction in – in a court over some claim but no jurisdiction over another, even if it's a different legal theory, something that would otherwise be regarded as one cause of action can't preclude a later case. So if Judge Wright – if Judge Hugg was correct that there were conditions placed on this claim – I mean, the – the Colvilles didn't have to keep jumping up and down to complain about that. I mean, if that was the basis on which they came in, that was the basis on which they came in. And they couldn't have raised anything else. They never – they never made that complaint at all, Your Honor. I understand. They didn't have to. They never made any effort. The condition was, in fact, a condition which would have precluded this argument. I don't think the fact they didn't complain about it has anything to do with anything. And I think the record – I think the record is contrary to that fact. I don't think that they were – that they were limited in any manner in making this claim. I think when you read your brief, read their – their brief, you see that they made a conscious – a conscious decision at that point not to raise that claim. They don't say that they – Not to raise what? That's what I'm having trouble with. To raise this claim now that they're saying, number one, as Mr. Sachse says, there is a, quote, Wenatchee tribe. There is no Wenatchee tribe. The Wenatchee tribe, as they admit, as Judge Marsh ruled and as this Court ruled is – Well, there are some people who have rights under the 1894 treaty. Yes, there are. Yes, there are. And in that regard, I would say, let's just let me offer counter to Mr. Sachse. I'd say probably half the people in the room are Yakama Wenatchee descent, but that's neither here nor there. But they're very interested in this as well. The fact of the matter is, is that they made the decision to proceed in the manner they proceeded. They went all the way to the United States Supreme Court on this issue. Now – But what I'm trying to understand is what's different? They were proceeding on behalf of the Wenatchee then, but he's proceeding on behalf of the Wenatchee now. They're – what else is – what's different? What's different or what's the same? What's different? I don't think that there's anything that's different. They're proceeding. Now they're saying, well, now we have a different theory of the 19 – or 1894 agreement than we had when we presented it and stipulated as to what it meant. We're basically the same people. We have a clearly imprivity with the prior plaintiffs in that case. Mr. Sachse criticizes me for saying they just went fishing. Well, the fact is they've never made a Rule 60B motion asking to amend this judgment. They never appealed the issue claiming they had another issue. I don't think – They didn't have to, did they? Well, I – you see, Your Honor, I – If they had a right – well, just listen. I'm sorry. For a second. Sorry. If they had a right under the 1894 agreement that was not litigated, then they weren't wrong in going ahead and fishing, were they? Well, I believe – I certainly believe they were. They have an injunction or they have a court ruling that says that they can't – that they can't fish off reservation. Now, once again, once again, you have to go back to – and this ties to the race to the front again, Your Honor. The 1894 agreement – They have a court ruling that says they can't fish off reservation or they don't have a court ruling that says they can fish off reservation. No, they have a court ruling that says they don't have any rights to fish off reservation. That's correct. That's correct. There's not a – Which would be as a result of that litigation which said they didn't have a treaty right. I have one other question I'd like you to address, and that is why weren't they limited by Rule 24A as to the subject matter that could be raised when the Coalville was – the condition of them entering was an interest relating to the subject matter of the litigation, namely an ability to assert the treaty rights. Why wouldn't they be limited just by Rule 24? Well, I think, of course, Your Honor, that at that point in time and continuing to this point in time, Article 10 and the agreement are functions of the Yakima Treaty. The 1894 agreement – Article 10 just – Arises only out of Article 10 of the treaty. Article 10 stock was ceded by the Yakima. That is true. The Yakima wouldn't answer. So now it's not as a result of the treaty. It's the result of the fact that when, as a condition to them ceding it, they said, look, you've got to take care of these people who have been living there all this time and fishing all this time. They said, okay, and that's the result of the 1894 agreement. Well, of course, but it's also the result of Article 10 of the Yakima Treaty, which is as a result of the treaty right. I don't think there's any question but that Colville had the opportunity in the prior case and weren't limited by Rule 24A to say to Judge Marsh, we have this theory that's based on the Wenatchipum Agreement, which arose as a result of Article 10 of the Yakima Treaty. The reason why we have this treaty, they might have if they had been willing to fraction off some of their sub-tribes, and then there's a question of whether there is a conflict for that reason, been able to say, well, maybe everybody else doesn't have a right that traces to the treaty, but this subgroup of people has a right that traces to the treaty because the 1894 agreement basically preserves that right to them. Your Honor, that was a significant issue in this case. Judge Marsh continually asked counsel for the Colvilles, what the rights they were asserting, whose rights they were asserting on behalf of, who was going to go fishing. As you correctly pointed out a little earlier, they changed their horse in midstream once they got to this court. They never responded to Judge Marsh in that regard. And then when they got to this court, they said, well, gee, we're only really representing these six tribes and their interests. But they were represented collectively rather than individually. And I think what Judge Hug is asking is, weren't they limited to that argument with regard to the conditions of their intervention, that they could not have raised an argument that was specific to one of the tribes and would only have succeeded in getting one of the tribes fishing rights? See, and that's where you run on the shoals of the discussion. They aren't tribes. They're the Colville Confederated tribe, and that's where you run into the shoal of it. Any organization, let's just take organizational standing on some things, any organization can come in and assert rights that don't go to all of its members but go to some subgroup of the members, all of our members who have X characteristic. And X characteristic in this case were people who got the allotments as a result of the agreement in 1894, whether that was a separate tribe or wasn't a separate tribe. Now, was there a limitation on the intervention in 1989 that prevented such a theory? I don't believe there was. I don't believe there was a limit on the intervention. I don't think Judge Marsh would have limited that had Colville said, we're, you know, asserting this right under this agreement that we have put forth. I thought he specifically said that these are the conditions for being allowed to intervene. What he said was is that you are going to need to establish your rights under a treaty. A treaty. That is correct, and that's exactly what was involved here. No. Article 10 of the treaty. What was involved here was rights under the 1894 agreement. And once again, Your Honor, I continue to maintain that that's a function without Article 10 of the treaty and any theoretical rights that flow from it, you don't have an 1894 agreement. Plus, of course, a whole different story is what that agreement says. It doesn't say what Mr. Saxe says it says. But I don't think that there simply isn't a question that they were not barred from bringing this theory. They chose not to bring this theory. And now they're coming back and saying we want another bite at the apple. One last question is from me, at least, is why did the Yakama Nation have any right at all to this fishery since they gave it up for $20,000 and Article 10 was ceded? Article 3 of the Yakama Treaty, Your Honor, which retains the right of the Yakama Indian Nation to fish at all of its usual and custom fisheries. So there was off-reservation and on-reservation.  And also the other, of course, the other. Well, then what was the basis for the ceding of Article 10 and the payment of the $20,000 to do it? So the United States didn't have to give us what they called the Wenatchipun fishery, which is six square miles of land. Yes. Which is what was claimed by the Wenatchipun. Well, of course, the Wenatchipun, if you want to follow his theory, we have about an equal number of the same people on the Yakama reservation. So, you know, the problem you come down to is these are communal rights, not individual rights. So with a pretty good idea that there were a lot of oil to fish there, both the Wenatchipun in the Yakama Nation and in Colville. And I don't know why they didn't go ahead and allow that. Well, because it ended up in a situation where the parties couldn't agree. And once again, I disagree with Mr. Saxe. None of what he said is in evidence or in the record as to those discussions. Okay. Thank you very much, counsel. A lot different than he's described them. Thank you very much. Mr. Saxe. A couple of quick things. I think the most useful thing you could tell us is what is the basis for your belief that you were you could not have raised this issue? There's a sufficiently distinct issue here that was not able to be argued. I'll answer that specifically. If you turn to page zero zero one of the excerpts from record, we have the opinion in which Doug Marsh set the conditions for intervention. And he discusses exactly what Judge Hugg was discussing. Where is 24 a. I'm sorry. Page 24. No, page one. First, the first page of our excerpts of record is the opinion. It's it's it says opinion. The United States district. I never wear in the opinion. Do you want us to look for what you say is that on the. Page five discusses the positions of the different parties on what the limitations should be. Page seven. He determines that their treaty rights are not frivolous and that they should be able to bring them. And on page eight, he establishes the limitations that they accept the law of the case and that they prove that they have the treaty rights. Okay. Now, so the premise of your theory is that that any rights that are traceable to the 1894 agreement are not treaty rights. That's correct. Why is that? Why is that? Those rights only arise essentially isn't what happened in 1894, that instead of giving up all of the treaty rights under Article 10, they only gave up some of them and some were reserved. Is that not what happened? No. The Yakima who had the treaty gave up everything. Right. Had to do with Article 10. And the Wenatchee who were not mentioned separately otherwise are mentioned specifically there as having the right to obtain allotments and because of the history of the negotiation to have fishing rights there. The big thing is we're not attacking anything that was said in the earlier decisions of the court. We're saying that apart from what was said in the earlier decisions of the court, there does remain this group that ought to be able to fish out of federal fish hatchery for surplus fish at their traditional ground or we at least should have the opportunity. I'm still actually having a hard trouble seeing how that theory, i.e. fishing at their traditional ground, traces to this agreement which is about a land conveyance. Donna, let me just make it very simple. I don't think you even have to approach that issue. It's very clear that Colville could not raise the Yakima disclaimer of rights in that area as part of the earlier pleading. Without that, they didn't have a full and fair opportunity to do this. Secondly, Wenatchee does exist as a unit. It's who Mr. Weaver sued. The name of the case is the people he sued. The Wenatchee constituent tribe is one of them. In your decision in federal three on this case, you specifically disagreed with Judge Marsh and held that the record shows that the constituent tribes in 1938 had identifiable cultural and political characteristics that led to their recognition. You said it's not that these tribes don't exist anymore. It's not that they merged with Colville. You said that they lost their treaty rights because they didn't do what the treaty said. They didn't move to the Yakima reservation. That was true for all the constituent tribes except the Wenatchee. They weren't supposed to move. That's just an error in this decision. They weren't supposed to move. It's irrelevant here because we're accepting it that they don't have the treaty right. If you corrected this, maybe they would have the treaty right. They certainly have a right under the 1894 agreement. We have the right to assert it in court and not be bound by res judicata. If there's doubt on this, I think the doubt ought to be resolved in favor of letting people who care a great deal about their rights assert those rights in court. And secondly, I would hope that if you do that, it would lead to a settlement in which both tribes could fish there. We've tried very hard to get that kind of settlement. But as long as the Yakima take the position that they've won everything in the case before and they don't need to talk to us, there's no way we'll ever get a settlement. Has this been submitted at all to our mediation unit? Not to your mediation unit because the Yakima, we tried to negotiate with the Yakima after the decision of the district court and were just told flat out no negotiation is possible. And with that being so, we didn't see any point in bringing it to your unit. We'd also had two senators trying to get them to negotiate. Mr. Weaver, if we were to give you some time to consider whether to submit this to have our mediators help you a bit with this, would you have any interest in doing that? Would you have any interest in having our mediators, who are really excellent, attempt to see whether we can make peace here rather than war? I've spent a lot of time in the mediation matters, Your Honor. I can't speak for my clients. Well, suppose we were to do as we often do, which is to vacate submissions, say, for two weeks and have somebody from the mediator's office contact you to see whether you wish to proceed. I think my clients would be willing to talk about that. And maybe something that should be considered is the fact that in the southern litigation that's brought up, it would be perhaps a question of whether the Yakama Nation still has fishing rights. That's an interesting question, Your Honor. And in that regard, I would say if you read my briefing where Colville filed a brief with the court where it said we're not challenging the Yakama's treaty rights in the previous case. Now, once again, they've changed that there. But this is a new litigation. Okay. Thank you very much. Thank you. Thank you.
judges: Hug, Berzon, Bybee